## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **NED COMER, ET AL.** | ) | **Case No: 1:11-cv-220-LG-RHW** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **MURPHY OIL USA, INC., ET AL.,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |

_____

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

### INTRODUCTION

This action is a re-filing of an original action of the same name (*Comer I*), involving the same plaintiffs and, since Miss. Code. § 15-1-69 allows for the filing of a "new" case there are additional defendants many of whom are named in the Fourth Amended Complaint filed under motion for leave to amend and awaiting disposition at the time this court originally dismissed Comer I.

The following is the time line history of the two filings:

*Comer I* filed: September 20, 2005

*Comer I* Motion for Leave to Amend to file 4th Amended Complaint: December 19, 2006

USDC order of dismissal: August 30, 2007

1

First scheduled oral argument 5th Circuit CA: August 6, 2008

Second scheduled oral argument 5 Circuit CA: November 3, 2008

5th Circuit CA panel decision: October 16, 2009 revised October 22, 2009

5th Circuit CA En Banc acceptance: February 22, 2010

Scheduled En Banc oral argument, May 24, 2010

Cancellation of En Banc hearing due to additional disqualification: April 30, 2010

5th Circuit CA dismissal due to lack of quorum: May 28, 2010

Petition for Writ of Mandamus filed, U.S. Supreme Court: August 26, 2010

Notice of no acceptance in conference, U.S. Supreme Court: January 10, 2011

Re-filing of present action: May 27, 2011

The above timeline, for the convenience of the Court, also underscores the efforts undertaken by the plaintiffs to pursue this matter in earnest on the substantive issues involved in the case and the continuing procedural hurdles that ultimately lead to delay and dismissal thereby causing the plaintiffs to re-file the present case based on their rights under the Abatement of Actions under Mississippi law. Plaintiffs now present the following argument and propositions in response and opposition to the above-referenced motions filed by the defendants:

I.  **Statute of Limitations**

A.  **Mississippi Law allows the re-filing of the action within one year.**

Defendants stress three things in support of their statute of limitations defense. One, that the case must be dismissed because it was dismissed with prejudice. Although there is no language in the 5th Circuit's order of dismissal that could be interpreted to be a dismissal with prejudice the very idea of the 5th Circuit taking such action runs contrary to the "lack of quorum" reasoning that lead to the rather strange disposition of the case.

This avoids the clear language of the Mississippi statute which states:

> If in any action, duly commenced within the time allowed, the writ shall be abated, or the action otherwise avoided or defeated, by the death of any party thereto, or for any matter of form, or if, after verdict for the plaintiff, the judgment shall be arrested, or if a judgment for the plaintiff shall be reversed on appeal, the plaintiff may commence a **new** action for the same cause, at any time within one year after the abatement or other determination of the original suit, or after reversal of the judgment therein, and his executor or administrator may, in case of the plaintiff's death, commence such *new* action, within the said one year.

Miss. Code. § 15-1-69 (emphasis added).

The case law in Mississippi is clear. Legitimate claims should not be decided on procedural grounds alone saving an abuse of the procedural rules by a litigant. Clearly the continued inability of judges to hear plaintiffs' claims and the essential breakdown in our federal judicial system is precisely the circumstance that would allow the plaintiffs to invoke the Abatement Statute. *Marshall v. Kansas City S. Rys. Co.,* 7 So.3d 210, 214 (2009)(quoting *Hawkins v. Scottish Union & Nat'l Ins. Co.*, 69 So. 710, 713 (Miss. 1915)).

### B. **The Plaintiffs' Re-filed the Action within One Year of the Dismissal of the Appeal**

Next, the defendants take the position that plaintiffs failed to exhaust their remedies.[1] Interesting language is contained in the Fifth Circuit's en banc dismissal, *Comer v. Murphy Oil USA*, 607 F.3d 1049, 70 ERC 1808 (5th Cir. (Miss.) May 28, 2010) (NO. 07-60756), at p.3, para. 3, "The Rule of Necessity--allowing judges to sit--is not applicable in this case because it would be inappropriate to disregard the disqualification of the judges of this court when the appeal may be presented to the Supreme Court of the United States for decision."  Further at p. 4, "Because neither this en banc court, not the panel, can conduct further judicial business in this appeal, the Clerk is directed to dismiss the appeal."

---

[1] Defendants seem to "shuffle through" a shotgun type approach by stating on the one hand that the dismissal is with prejudice, on another that plaintiffs did not exhaust their remedies, and on still another that plaintiffs did not avail themselves of the abatement statute in time because they chose the wrong approach at the Supreme Court.

The parties, of course, have the right to petition the Supreme Court of the United States. In this instance the plaintiffs did just that by way of a petition for writ of mandamus. This will largely turn or whether plaintiffs were obligated to pursue a petition to the Supreme Court or were free to re-file upon dismissal by the Fifth Circuit Court of Appeals. Certainly both the language of the state and Mississippi case law support the notion that re-filing is an option immediately upon dismissal by a lower court, but likewise supports the notion that appeal is available as an option and that there is no final judgment until the choice of appellate vehicle is exhausted.  The case law is very liberal in favor of allowing plaintiffs to re-file even to the point of recognizing the policy of good faith mistake.  Plaintiffs in Mississippi practice have been allowed to refile after failing to comply with Mississippi's medical malpractice administrative procedure.  *See Pringle v. Kramer*, 40 So3d 516 (Miss. 2010).  The Court also recognizes the application of the statute when a plaintiff makes what later appears to be a mistake as to subject matter jurisdiction and has repeatedly recognized the good faith consideration.  *W.T. Raleigh Co. v. Barnes,* 143 Miss. 597, 109 So. 8(1926); *Crawford v. Morris Transportation, Inc., et al*., 990 So2d 162 (Miss. 2008). As to whether a Petition for Writ of Mandamus is the appropriate vehicle, it may first appear to be open for debate but a more considered and learned examination leads only to the petition for writ of mandamus as the vehicle since there is no final judgment. The risk of taking an improper appeal most certainly results in dismissal, and under the rules a party cannot choose both appeal and mandamus because a petition for writ of mandamus must necessarily state that there is no other adequate remedy at law.  To have pursued both would have nullified the petition for writ of mandamus and without a final judgment caused a likely dismissal of an appeal.  Even if in the unlikely event the court determines that the writ of

mandamus was not the best vehicle, the worst case for the plaintiffs is that they were in a procedural "quagmire" at least as daunting as the one set forth in the case of *Pringle*.[2]

Finally, certain defendants take the position that since they were not joined in the case at the time of dismissal by this Court that the statute of limitations ran while plaintiffs were fighting their way through the process as outlined in the above timeline. This argument fails in both logic and practicality. First, the plaintiffs tried to amend with the Fourth Amended Complaint filed within the statute of limitations. Second, there was never another chance to amend in the additional defendants, a common practice, until the case was finally rejected by the United States Supreme Court and lastly, the Mississippi Abatement of Actions Statute clearly states that a party is entitled to file a *new* case.   One of the definitions of the word "new" as defined in Merriam-Webster's dictionary is the "beginning as the resumption or repetition of a previous act or thing."[3]

Combining common sense and common legal practice sense one gets the impression that the Mississippi Legislature intended for all of a filing party's rights to be protected just as though starting the process anew. That means that all responsible parties can and should be joined according to the knowledge and discretion of the filing party. To apply the law in any other way would negate the clear, common sense intent of the legislature and, especially in view of the procedural history of this case, totally avoid the obvious goal of fairness intended by the statute. The abatement provision of Miss. Code 15-1-69 is a way of recognizing the need for justice over the need for judicial housekeeping and is a fundamental right of fairness.  Whether this right is viewed as "equitable tolling" or simply an extension of and a renewal of the status of limitations

---

[2] Perhaps this rather odd set of circumstances leading to dismissal falls into the "otherwise avoided or defeated" language of the Abatement Statute.
[3] http://www.merriam-webster.com/dictionary/new.

is not particularly relevant.  The salient concept is one of a fundamental objective of the law to insure that substantive issues and legal rights are addressed.

The Mississippi Supreme Court has held that Miss. Code 15-1-69 "applies to those cases "'[w]here the plaintiff has been defeated by some matter not affecting the merits, some defect or informality, which [the plaintiff] can remedy or avoid by a new process…'" so long as the plaintiff re-files within one year of the dismissal.  *Marshall v. Kansas City S. Rys. Co.,* 7 So.3d 210, 214 (2009)(quoting *Hawkins v. Scottish Union & Nat'l Ins. Co.*, 69 So. 710, 713 (Miss. 1915)).  Further, Mississippi jurisprudence has long held that this right of re-filing when there is no decision on the merits is "highly remedial" and "ought to be liberally construed."  *Id.* (internal quotations omitted).

As a last point, and one that will become increasingly important in this and other climate-related litigation, the plaintiffs point to the continuing nature of the offenses against their property rights. Torts are generally divided into four parts before they become actionable: duty, breach of duty, causation and damages. *See,* Prosser and Keeton On The Law Of Torts § 30, at 164 (5th ed. 1984).

In the present case there is harm already done and continuing harm that will without a doubt take place in the future. In the Supreme Court's finding in *Massachusetts v. EPA*, 549 U.S. 497 (2007), the majority cited at length studies by the National Research Council (NRC) concerning the well-documented harms caused by climate change.

> The harms associated with climate change are serious and well recognized. Indeed, the NRC Report itself--which EPA regards as an "objective and independent assessment of the relevant science," *68 Fed. Reg. 52930* --identifies a number of environmental changes that have already inflicted significant harms, including "the global retreat of mountain glaciers, reduction in snow-cover extent, the earlier spring melting of ice on rivers and lakes, [and] the accelerated rate of rise of sea levels during the 20th century relative to the past few thousand years . .. "

549 U.S. at 521 (citing NRC Report at 16).

The Court also noted the "eerily prescient" predictions of one affiant in support of the Massachusetts plaintiffs concerning the threat from hurricanes to New Orleans and the Gulf Coast. *Id. at* 522 & n. 18.

It is clear. This Earth and Her people are in serious trouble and with each passing day, and since the *Massachusetts,* the news becomes more and more troubling. See e.g., Field, C.B. et al., *2007: North America. Climate Change 2007, Impacts, Adaptation and Vulnerability.* Contribution of Working Group II to the Fourth Assessment Report on the Intergovernmental Panel on Climate Change, at 623[4]; Biasutti, et al., *Projected Changes in the Physical Climate of the Gulf Coast and Caribbean*, (Oct. 2011)[5]   And it is troubling on more than a human level. Increasing property insurance rates provide evidence of a world at risk. See the statements of Lindene Patton, Chief Climate Science Product Officer of Zurich Financial Services, in her Geneva Association paper, *Why Insurers Should Focus On Climate Risk Issues*:

> […]society at large at the time of its greatest need. Unless global risk management of climate change improves, the mismatch between the loss exposure and monies needed to cover economic loss associated with climate change-related severe weather events and other impacts will only become more extreme.

The author is not talking about the past; she is talking about the future. This case is dealing with a continuing tort, portions of which cannot be brought before the court without the occurrence of future events, but parts of future harm can be addressed now with proper damage modeling. The logical conclusion is that there is not a statute of limitations defense for the past damage and future damages are either yet to come or can be projected with reasonable certainty in the form

---

[4] Available at http://www.ipcc.ch/pdf/assessment-report/ar4/wg2/ar4-wg2-chapter14.pdf.
[5] Available at  http://www.ldeo.columbia.edu/~suzana/papers/biasutti_etal_climchange_earlyonline.pdf.

of insurance costs and diminution in the value of property. There is no end in sight for increased, serious, and foreseeable property damage.

The question therefore becomes, "when does the statute of limitations expire for an ongoing activity that that creates a public and private nuisance, trespass, and the ongoing negligent destruction of property". Restatement (Second) of Torts § 821D cmt. e (1977).[6] Presumably defendants take the position that the statute does not begin to run until causation is reasonably known and accepted by the population as a whole or at the very least placed on notice by an expert in the field. But perhaps the more important issue is the continuing nature of the torts alleged. *Hoery v. U.S.* 64 P.3d 214 (Co.2003) provides a classic analysis and definition of continuing torts and the tolling of the statute of limitations.  In that case, involving toxic pollution the Court noted, "The elements for the tort of trespass are a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property." Id at 217. Analyzing the plaintiffs' claims further the Court said, "Another type of property invasion is a nuisance. A claim for nuisance is predicated upon a substantial invasion of an individual's interest in the use and enjoyment of his property".  Id. Finally on a statute of limitations for pollution that is continuing the Court explained,

> For continuing intrusions-either by way of trespass or nuisance-each repetition of continuance amounts to another wrong, giving rise to a new cause of action. The practical significance of the continuing tort concept is that for statute of limitations purposes, the claim does not begin to accrue until the tortious conduct has ceased.

Id at 218.

---

[6] It should be noted that defendants have repeatedly stated before this Court, at the 5th Circuit, and in the face of the U.S. Supreme Court's causation observations in Massachusetts v. E.P.A. that plaintiffs cannot prove causation nor proximate cause. In fact, the first order entered in Comer I alludes to the consideration of Rule 11 sanctions if plaintiffs are unable to prove a causal link. *Comer, et al v. Murphy Oil USA*, Inc., et al,  Case 1:05-cv-00436-LTS-RHW Document 74, at 4.

It is unfortunate that the defendants have created a monopolistic energy structure that does not allow their tortious conduct to end. It is however what the defendants designed and it was not without warning. Like all the rest of us they now have to face their responsibility, no matter what.

**C.     For Whom American Pipe Tolls**.

The Supreme Court has recognized that class actions are efficient tools in limiting the filing of repetitious lawsuits and preserving judicial economy.  In encouraging the use of class actions where appropriate, the Court recognized the needs to protect the due process rights of the putative class members so that they neither feel the need to intervene in the pending class nor get caught sitting on their rights unprotected.  The Court made this clear in *American Pipe v. Utah*, 414 U.S. 538, 552 (1974):

> During the pendency of the District Court's determination in this regard, which is to be made "as soon as practicable after the commencement of an action," potential class members are mere passive beneficiaries of the action brought in their behalf.  Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case.  It follows that even to asserted class members who are unaware of the proceedings brought in their interest or who demonstrably did not rely on the institution of those proceedings, the later running of the applicable statute of limitations does not bar participation in the class action and in its ultimate judgment.

Under the reasoning set forth in the *American Pipe* series of cases, the putative class members are still within the primary statute of limitations, not the one year period of the Abatement Statute.  In the worst case scenario there would need to be simply "new" class representatives joined in this "new" cause of action to make it a viable case, duly filed, and ready to proceed with all deliberate speed within the federal system.

II.  **In Personam Jurisdiction, Subject Matter Jurisdiction, Proximate Cause,.**

**A. The Court has personal jurisdiction over the defendants based on their actions causing injury and their minimum contacts with the jurisdiction.**

There exists a balancing and fairness doctrine in United States Constitutional history. That history weaves through various issues and leaves room for judicial interpretation depending on changing society, changing technology, changing needs and fairness. The relation of the parties, relative harm versus benefits and strengths, as well as the relationship between federation and state all lend to an analysis that overlaps when applying circumstance to law.

Beginning with *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) the Supreme Court explained that the minimum contacts standard is not a mechanical test, but one that depends on the "quality and nature of the activity in relation to the fair and orderly administration of laws." Later, and as a recognition of the tremendous impact of technology and commerce the Supreme Court grappled with the concept of foreseeable impact in *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed. 2d 490 (1980). The decision revolved around the issue of the foreseeability of a particular incident and left open the broader principle as enunciated in International Shoe.

Then came the "purposely directed activities" period, *Ashai Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed. 2d 92 (1987), and the "effects cases" of *Calder v. Jones*, 465 U.S. 483, 104 S.Ct. 1482, 79 L.Ed. 2d 804 (1984) and *Keeton v. Hustler Magazine, Inc*. 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed. 2d 790 (1984).

In the case before this court there are two fundamental issues to be considered when applying the analysis set forth by the above-referenced cases. One is foreseeable effect or impact and the other is general jurisdiction pursuant to the State of Mississippi's jurisdiction laws. Without doubt there has been foreseeable impact and effect. The scientific history is clear. The

warnings were sounded decades ago. The response was a well orchestrated pack or untruths by industry in denying the science as a hoax and the results grow more exponentially disastrous with each ton of greenhouse gases that are released into the atmosphere in the pursuit of profit. And general jurisdiction exists as a result of the contract activities of many of the defendants as well as the commission of a tort in whole or in part in the state of Mississippi. The Mississippi Long Arm Statute, section 13-3-57, Miss. Code Ann. states:

> Any non-resident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as doing business herein, who shall make a contract with a resident of this state to be performed  in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state, or who shall do any business or perform any character of work or service in this state shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

All the defendants have committed a tort in Mississippi by their activities.  They have damaged the property of the plaintiffs.  They have trespassed on the property of the plaintiffs.  Their activities present a continuing nuisance to the plaintiffs. They ship their products to Mississippi for use.  They sell their product along transmission lines for use in the state. They own or control business entities in the state that generate energy or buy energy from their other controlled subsidiaries.  The same fact analysis applies to the other defendants whose contacts with the state may not be clear at first glance but upon inspection are sufficient to impose personal jurisdiction.

For example, Entergy Corporation has been sued in Mississippi by the Attorney General to seek information concerning rates paid by Mississippi Consumers.[7] Further as an example of

---

[7] See *Mississippi, ex rel., Jim Hood, Attorney General for the State of Mississippi v. Entergy Mississippi Inc., et al*, Chancery Court of Hinds County, Mississippi, Case No. C2008-2086, in which the Attorney General said about Entergy Corporation, a named defendant: "Entergy is operating with in the State of Mississippi. … As a corporate parent, Entergy has, and exercises complete dominion and control over EMI's electricity and fuel services. Entergy also exercises complete dominion and control over EMI's management, finances, policy and business practices, including the procurement of fuel and transportation services, the output of EMI's generating units as well as the purchase, sale and resale of electricity on the wholesale power market on behalf of EMI, making EMI's customers captive to Entergy's wishes and predatory practices."

the lack of candor of defendants in this case, Entergy makes a disingenuous and unsupported statement that in personam jurisdiction does not exist but Entergy does not truthfully apprise the court of it's true activities within the state. This is but one instance of specific contacts with the State of Mississippi by one defendant. Proof of other specific contacts will be fact intensive and is not appropriate for Rule 12 consideration without an appropriate level of discovery. Preceding such a determination, plaintiffs would suggest to the court that at an early stage of a scheduling order, the court should order disclosures regarding each defendants' contacts with the State of Mississippi as well as all activities and information that relate to each defendants monitoring of climate change science, it's anticipated impact, and each defendant's response, if any.

But the larger jurisdictional issue and the one that is applicable uniformly to every defendant falls within *the International Shoe* context. Returning to that analysis, along with the above cited "purposely directed activities" and "effects" cases we refer the court back to the quoted language above from *Massachusetts v. EPA* entitled "The Injury" and further refer the court to this other language from Massachusetts:

> When Congress enacted these provisions, the study of climate change was in its infancy.[8] In 1959, shortly after the U. S. Weather Bureau began monitoring atmospheric carbon dioxide levels, an observatory in Mauna Loa, Hawaii, recorded a mean level of 316 parts per million. This was well above the highest carbon dioxide concentration, no more than 300 parts per million revealed in the 420,000-year-old ice-core record.[9] By the time Congress drafted §202(a)(1) in 1970, carbon dioxide levels had reached 325 parts per million.[10]

Id at 507. [8]

---

[8] Notes 8-10

> [8]The Council on Environmental Quality had issued a report in 1970 concluding that "[m]an may be changing his weather." Environmental Quality: The First Annual Report 93. Considerable uncertainty remained in those early years, and the issue went largely unmentioned in the congressional debate over the enactment of the Clean Air Act. But see 116 Cong. Rec. 32914

It is beyond comprehension that the multi-national companies, some of whom have been forced into carbon reduction programs in other countries, did not require the requisite notice or scientific knowledge that there was an impending environmental train wreck coming, or at least that the consequences from the indisputable risk was so great that action and correction of activities should be undertaken. This again is a fact intensive analysis but at this present stage of the litigation the findings by mainstream science as recognized and accepted by The United States Supreme Court should suffice for "foreseeability" challenge of *International Shoe* as well as the "purposely directed activities" and "effects" analyses would seem to be adequately met.

Summing up and in a segue into the related causation and proximate cause analysis below the plaintiffs suggest to the court that subject matter and *in personam* jurisdictional requirements have been met at this stage of the proceedings and that defendants will be free to reurge their position after limited discovery.  And as a final point in the form of a question, "Where else do we go?"  Like the person who throws a rock from one side of the Missouri River in Kansas City, Kansas into a crowd in Kansas City, Missouri and causes injury.  Plaintiffs suggest that the rock thrower without question gave unto himself an opportunity to be sued in the State of Missouri.

**B. The plaintiffs' complaint states a cause of action against defendants who caused damage and whose actions were the proximate cause of the damage.**

---

(1970) (statement of Sen. Boggs referring to Council's conclusion that "[a]ir pollution alters the climate and may produce global changes in temperature").

[9] See Intergovernmental Panel on Climate Change, Climate Change 2001: Synthesis Report, pp. 202–203 (2001). By drilling through thick Antarctic ice sheets and extracting "cores," scientists can examine ice from long ago and extract small samples of ancient air. That air can then be analyzed, yielding estimates of carbon dioxide levels. *Ibid.*

[10] A more dramatic rise was yet to come: In 2006, carbon dioxide levels reached 382 parts per million, see Dept. of Commerce, National Oceanic & Atmospheric Administration, Mauna Loa $CO_2$ Monthly Mean Data, www.esrl.noaa.gov/gmd/ccgg/trends/co2_mm_mlo.dat (all Internet materials as visited Mar. 29, 2007, and available in Clerk of Court's case file), a level thought to exceed the concentration of carbon dioxide in the atmosphere at any point over the past 20-million years. See Intergovernmental Panel on Climate Change, Technical Summary of Working Group I Report 39 (2001).

Quoting from *Massachusetts v. EPA's analysis of causation*: "EPA does not dispute the existence of a causal connection between man-made greenhouse gas emissions and global warming. At a minimum, therefore, EPA's refusal to regulate such emissions 'contributes' to Massachusetts' injuries." 549 U.S. at 523. The causation findings are not only unequivocal with reference to pure causation but when the history of scientific knowledge and development is overlaid with the findings in *Massachusetts v. EPA* is combined with similar recognitions in *American Electric Power Co. (AEP) v. Connecticut*, 131 S. Ct. 2527 (2011), there is significant support solely within these two cases along to refute a FRCP 12 proximate cause defense without even turning to the most *recent* mainstream science.

To avoid a Rule 12(d) analysis at this early stage plaintiffs have determined not to submit affidavits in support of this opposition, but it is assured that the science since *Massachusetts* is even more firm and unequivocal, if that is possible, and points to a tipping point that is upon us and moving at a far greater pace than the worst case scenarios and the defendants knew, they did nothing and plaintiffs are an inordinately affected group.[9] And with regard to the "foreseeability" issue, pertinent to this and the jurisdictional analysis, we turn again to language from *Massachusetts v. EPA*:

> And reducing domestic automobile emissions is hardly a tentative step. Even leaving aside the other greenhouse gases, the United States transportation sector emits an enormous quantity of carbon dioxide into the atmosphere--according to the MacCracken affidavit, more than 1.7 billion metric tons in 1999 alone. That accounts for more than 6% of worldwide carbon dioxide emissions. To put this in perspective: Considering just emissions from the transportation sector, which represents less than one-third of this country's total carbon dioxide emissions, the United States would still rank as the third-largest emitter of carbon dioxide in the world, outpaced only by the European Union and China. Judged by any standard, U. S. motor-vehicle emissions make a meaningful contribution to greenhouse gas concentrations and hence, according to petitioners, to global warming.

---

[9] Justin Gillis, *Carbon Emissions Show Biggest Jump Ever Recorded,* N.Y. Times, December 5, 2011 at A-4.

Id at 524. (Citations and Footnotes Omitted).

The point made here is that a long time ago the defendants were on notice that individually and as a part of the industrial sector they were or should have been aware of the effects and potential effects of their activities and were under a duty to make changes even if those changes were incremental and only partially solved the problem. *Massachusetts v. EPA* makes it clear that one can be held responsible and liable in spite of the inability to solve the entirety of a problem: "That a first step might be tentative does not by itself support the notion that federal courts lack jurisdiction to determine whether that step conforms law." id at 499.

**C. It is clear that the plaintiffs have standing to bring this action to federal court because it is an action for damages and not injunctive relief.**

We refer the court back to the quoted language above from *Massachusetts v. EPA*, *id.*, entitled "The Injury" and further refer the court to other language from Massachusetts which states:

> The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1984); *see also Judice v. Vail*, 430 U.S. 327, 331 (1977) ("[W]e are first obliged to examine the standing of appellees, as a matter of case-or-controversy requirement associated with Art. III") "The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts." *Pagan v. Calderon*, 448 P.3d 16, 26 (1st Cir. 2006) (citing *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Because this is a diversity case both state and Article III standing must be met as a necessary requisite to adjudication. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F. 3d 168, 173 (2d Cir. 2005); 13B Charles S. Wright, et al., FEDERAL

PRACTICE & PROCEDURE § 3531.14 n. 28 (3d ed. 2009). Plaintiffs' claims clearly satisfy Mississippi's liberal standing requirements. *See Van Slyke v. Bd. of Trustees of State Institutions of Higher Learning*, 613 So.2d 872, 875 (Miss. 1993) (*Van Slyke II*). The Mississippi Constitution provides that "[all] courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay," Miss. Const. art. III, § 24. Because Mississippi's Constitution does not limit the judicial power to cases or controversies, its courts have been more permissive than federal courts in granting standing to parties. *See Van Slyke II*, 613 So. 2d at 875; *Canton Farm Equip., Inc. v. Richardson*, 501 So.2d 1098, 1106-1107 (Miss. 1987). "In Mississippi parties have standing to sue when they have a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law." *State v. Quitman County*, 807 So.2d 401, 405 (Miss. 2001). The plaintiffs have clearly alleged that their interests in their lands and property have been damaged by the adverse effects of defendants' greenhouse gas emissions. Accordingly, they have standing to assert all of their claims under Mississippi law.

More rigorous standards apply in a federal standing inquiry. Article III of the United States Constitution limits federal court jurisdiction to case and controversies. "Those two words confine 'the business of federal courts to questions presented in an adversary context and in a form historical viewed as capable of resolution through the judicial process. " *Massachusetts v. E.P.A.*, id. Article III standing is an "irreducible constitutional minimum," which requires plaintiffs to demonstrate: they have suffered an "injury in fact"; the injury is 'fairly traceable' to the defendants' actions; and the injury will "likely....be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted).

The claimant bears the burden of establishing standing, and "each element of the three part standing inquiry must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages fo the litigation." *Lujan*, 504 U.S. at 560-561.  When considering standing at the pleading stage general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Bennett v. Spear*, 520 U.S. 154, 168 (1997) *see also Metro. Wash. Airports Auth. V. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264-65 (1991) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint." *Flagstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109-19 (1979); *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The plaintiffs have clearly satisfied the first and third constitution minimum standing requirements in their nuisance, trespass and negligence causes.  These state common-law tort claims, in which plaintiffs allege that they sustained actual, concrete injury in fact to their particular lands and property, can be redressed by the compensatory and punitive damages they seek for these injuries.  As to these claims, defendants do not contest standing on the first and third prongs of the tripartite test.

Instead, defendants seem to continue to challenge the plaintiffs' standing at the second prong of the federal standing inquiry.  They argue that the plaintiffs have not shown that the harm alleged are fairly traceable to defendants' actions.  Defendants contend that the plaintiffs' theory tracing their injuries to defendants' actions is too attenuated.  However, this argument, which essentially calls upon the court to evaluate the merits of plaintiffs' causes of

action, is misplaced at this threshold standing stage of the litigation.  It is firmly established "that the absence of a valid cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case."  *Steel Co.* v. *Citizens for a Better Environment* 523 U.S.83, 89 (1998) (citing generally 5A Wright & Miller, Federal Practice and Procedure, sec. 1350 n.8 and cases cited (2d Ed. 1990).  As the Supreme Court stated in *Bell v. Hood,* 327 U.S. 678, 685 (1946), "jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to  state a cause of action on which petitioners could actually recover."   More specifically, for issues of causation, the Article III traceability requirement "need not be as close as the proximate causation needed to succeed on the merits of a tort claim.  Rather, an indirect causal relationship will suffice, so long as there is "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant."  *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009); *see also Bennett v. Spear*, 520 U.S. 154, 168 (1997) ("Proximate cause" of [plaintiffs'] harm" is not equivalent with their "injury 'fairly traceable' to the defendant" for standing purposes).

**D. The action of plaintiffs' whether in federal common law or under a state cause of action is not preempted by federal statute.**

In the Articles of Confederation Thomas Jefferson omitted any significant protection of property rights. When writing the considerable majority of the United States Constitution James Madison famously corrected Jefferson's omission and is quoted as saying, "Government has two fundamental purposes, the protection of personal freedoms and the protection of property rights. Then was born the 5th Amendment to the Constitution as well as the 14th Amendment thereby recognizing the sanctity of property rights and the relationship of respect between the national government and the individual states.

Since then a fairly specific body of law has developed regarding the balancing of the national interests with and against the rights of states to protect their citizens and frame the laws that will govern and protect their citizens. One of the areas of law that has uniquely developed as a result of this balancing is the occasion when "federal common law" is developed and/or applied. It is of no small matter that this delicate relationship between the national government and the states has on occasion led to what in the beginning was considered by many to be impermissible, then odd and rare, and now an important part of federal jurisprudence that is used, but used carefully and when state law cannot be adequately or fairly adapted to a matter of national concern or where there is a vacuum.

But first, a discussion about preemption in the absence of a federal common law discussion is appropriate. It is clear that the Supreme Court, in applying the Supremacy Clause of the Constitution has found that *Massachusetts v. E.P.A.*, has preempted the plaintiffs in *Connecticut v. AEP*, from pursuing an action that would invade the field that the EPA occupies, even if the E.P.A. has done not a thing with its duties or authority--insofar as any injunction relief is sought by the plaintiffs in Connecticut. In this case the plaintiffs do not seek injunction relief, rather solely monetary relief. [10] In the last paragraph of *Connecticut* the monetary issue and preemption were mentioned but the Supreme Court declined to address the issue saying,

> The plaintiffs also sought relief under state law, in particular, the law of each State where the defendants operate power plants. The Second Circuit did not reach the state law claims because it held that federal common law governed. In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act. None of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law. We therefore leave the matter open for consideration on remand.

---

[10] Native Village of Kivalina, et al, v. ExxonMobil Corporation, et al. is another example of a case where individuals are seeking monetary damages for a loss to property based on the actions of corporate actors. The case, originating in the Northern District of California, was argued before the Ninth Circuit last month. C.A No. 09-17490.

Id at 2540.  (Citations omitted).

But there really is not a great deal of guidance needed as these issue have been clearly addressed in other litigation. First, it is virtually undisputed that the principles of *Baker v. Carr*, 369 U.S. 186 (1962), nor the principles enunciated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), have very rarely been applied to cases asking for monetary damages, it being the thought that the courts, not the political branches, are best equipped to handle compensatory disputes between private citizens. Thus even taking the considerations applied in the political question and standing discussion above we see a common thread weaving between these two seemingly distinct topics, that being the separation of powers and the need clearly identify who will do what.

One of the things that Congress does is address issues of national significance and pass laws that sometimes displace and "preempt" state law and the bringing of claims pursuant to state law. But Congress must be specific. It has been clearly held time after time that if Congress is not clear and specific then the federal courts will not interfere with state law and litigants who bring their claims under state law. In Wyeth v. Levine, 555 U.S. 555, (2009), the Court noted:

> Second, '[i]n all pre-emption cases, and particularly in those in which Congress has "legislated in a field which the States have traditionally occupied, [we] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. *Lohr*, 518 U.S., at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 230 (1947).

And insofar as the argument that Congress has so authorized the E.P.A. to "occupy the field" with regard to regulation of greenhouse gas emissions plaintiffs would point to *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493 (1971) in which the Supreme Court first made abundantly clear in a Clean Water Act case that the federal courts had clear authority to decide

disputes between different States and between a State and citizens of another state seeking to abate a nuisance based on conduct that produces noxious consequences.  Moreover, "[t]he courts have long and consistently rejected assertions that the enactment of regulatory statutes like the Clean Air Act and the Clean Water Act preempt states from public nuisance actions."[11]

In *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981), the Court held that the federal common law of nuisance was preempted by the 1972 amendments to the Clean Water Act, which comprehensively occupied the field. *Id.* at 327-32. In doing so, however, the Court noted that the CWA preserved nuisance suits under state common law, see id, at 327-29, and stated further that:

> ([T]he appropriate analysis in determining if federal statutory law governs a question previously the subject of federal common law isnot the same as that employed in deciding if federal law pre-empts state law. In considering the latter question "'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S.218, 230 (1947)). While we have not hesitated to find pre-emption of state law, whether express or implied, when Congress has so indicated, see *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978), or when enforcement of state regulations would impair "federal superintendence of the field," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963), our analysis has included "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243 (1959).

*Id.* at 316 (parallel citations omitted).

The CAA lacks any damages remedy for air pollution victims. The *Connecticut* Court recognized that remedies are at the heart of the displacement inquiry and cited *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226 (1985), for the basic proposition that the "reach of remedial provisions is important to the determination of whether a statute displaces federal common law." 131 S.Ct. at 2538. Further, a claim for injunctive relief pursuant to a nuisance

---

[11] See Philip Weinberg, *"Political Questions": An Invasive Species Infecting The Courts*, 19 Duke Envtl. L. & Pol'y F. 155,162-63 (2008)

theory is different than a claim for monetary damages pursuant to a nuisance theory. In the first the court must weigh the utility of the action as opposed to the harm done and then take the very severe step of stopping the activity if the the good bad outweighs the good. In a nuisance action monetary action the court might find that the utility test is satisfied and yet still award monetary damages so as to compensate the innocent victim. Restatement (2d) of Torts, sec. 821(B) cmt. i (1979), sec. 826, cmt. f..

Further, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 n.7 (2008) makes it clear that "private claims for economic injury" under federal law survive a statute that displaces injunctive claims, thereby putting to rest any reliance on *Milwaukee v. Illinois*, 451 U.S. 304 (1981) or *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1 (1981). The CAA simply has no remedy for plaintiffs, no prohibition of state-based claims, and no activities AT ALL by the E.P.A. that could even arguably, albeit contrary to *Wyeth*, id, be considered to be a displacement of plaintiffs' claims.

Now is the time to return to a discussion of federal common law. Federal common law comes in a number of different forms. Sometimes Congress expressly delegates common lawmaking authority to the federal courts. Fed R. Evid. 501.   Sometimes the delegation is implicit like the Sherman Antitrust Act, 15 U.S.C. §§1-7, and at other times, as with maritime law, it grows out of a body of accepted principles that require the federal courts to fill a vacuum in the laws of states. It is just a step beyond this idea of explicit or implicit delegation to say that when Congress leaves gaps in federal statutes-when it fails to specify a measure of damages or when the application of any one law of any on state does not address a more widespread problem then the application or development of a federal common law standard may be appropriate and lend uniformity to the results. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 369

(1943). Early on *Clearfield*, id, recognized the need for federal courts to fashion rules of law where Congress is absent regarding a specific mandate of preemption or a specific set of rules regarding disputed issues.

However, it is long established that not only do federal courts have the discretion to apply state law in the absence of clear congressional intent and mandate. Indeed courts should be reluctant to fashion a pure federal common law rule in the absence of a Supremacy Clause mandate that is clear and specific, *Wyeth*, *supra*,.and especially if state law is reasonable. *DeSylva v. Ballentine*, 351 U.S. 570, 580 (1956) stating, "The scope of a federal right is, of course a federal question, but that does not mean that it's content is not to be determined by state, rather than federal law." *See also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83-86 (1994).

The frequent use of state law in cases of nation importance reflects a basic aspect of federalism and recognizes that the Congress legislates against a background of existing state law and that federal law retains its "incomplete and interstitial nature" even in the midst of a national regulatory scheme. *Kembell Foods, Inc*. 440 U.S. 715, 728-29 (1979); *Wallis v. Pan Am Petroleum Corp*., 384 U.S. 63, 68 (1996); Paul J. Mishkin, The Variousness of "Federal Law": Competence and discretion in the Choice of National and State Rules for Decision, 105 U. PA. L. REV. 797, 811 (1957).

There is therefore a defined set of rules but with considerable discretion that favors:

1. The application of state law in the absence of a clear preemptive mandate from Congress or the frustration of national policy;

2. In which event state law should be examined and fashioned into a remedy that addresses the issues;

    3. Failing of which a federal common law remedy is an appropriate approach. [12]

The Supreme Court has further stated:

    [W]e have recognized that public nuisance law, like common law generally, adapts to changing scientific and factual circumstances, Missouri [v. Illinois], 200 U.S. [496] at 522 [1906](adjudicating claim though it did not concern "nuisance of the simple kind that was known to the older common law"); S*ee also D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 472 (1942) (Jackson, J., concurring) ("federal courts are free to apply the traditional common-law technique of decision" when fashioning federal common law.)

*Connecticut,* at 2538.


## Conclusion

    For the foregoing reasons plaintiffs urge the defendants' Motion to Dismiss be denied.



Dated:   December 9, 2011

                        Respectfully submitted,

                        /s/ F. Gerald Maples
                        F. Gerald Maples (MS #1860)
                        federal@fgmapleslaw.com
                        One Canal Place
                        365 Canal Street, Suite 2650
                        New Orleans, Louisiana 70130
                        Telephone: (504) 569-8732
                        Facsimile: (504) 525-6932
                        Attorneys for Plaintiffs

## Certificate of Service

    I hereby certify the following ECF parties were served by the Clerk's CM/ECF system with ECF notice of filing of this pleading on December 9, 2011.

Allison Denise Wood - PHV     awood@hunton.com

---

[12] *Semtek Inat'l Inc. v. Lockheed Martin Corp.* 531 U.S. 497 (2001), in which Justice Scalia sets forth his views of the relevant standards.)

Andrew Scott Friedberg - PHV     andrew.friedberg@apachecorp.com

April C. Ladner     aladner@hortmanharlow.com

Barrett H. Reasoner - PHV     breasoner@gibbs-bruns.com,

Ben H. Stone   bstone@balch.com,

Benjamin McRae Watson     ben.watson@butlersnow.com,

Brittany L. Buckley - PHV     brittany.buckley@keanmiller.com,

Chad Matthew Clamage - PHV     cclamage@mayerbrown.com

Charles E. Ross     cer@wisecarter.com,

Charles Henderson Abbott     cabbott@csa-lawfirm.com,

Charles S. Kelley - PHV     ckelley@mayerbrown.com,

Christopher W. Barnes - PHV     chris.barnes@apachecorp.com

Daniel P. Collins- PHV   daniel.collins@mto.com

David Turkle Buente - PHV     dbuente@sidley.com

Edward R. Haden- PHV   ehaden@balch.com

Harriet A. Cooper   hacooper@tva.gov

F. Wiliam Brownell - PHV     bbrownell@hunton.com

J. Stephen Kennedy     skennedy@bakerdonelson.com,

J. Wyatt Hazard     whazard@danielcoker.com,

James Earl Graves , III     jeg@wisecarter.com,

James P. Gaughan - PHV , Jr     jgaughan@schiffhardin.com

James W. Snider , Jr     jsnider@entergy.com

James Wiblourn Vise  willvise@mhvplaw.com

Jeffery P. Reynolds     jeff@jprpa.com

Jerome C. Roth-PHV   jerome.roth@mto.com

John G. Corlew      jcorlew@cmslawyers.com

John G. Wheeler      jwheeler@mitchellmcnutt.com

Jonathan Talamini PHV jonathan.talamini@aporter.com

Jonathan L. Marsh - PHV      jlmarsh@kslaw.com

Jonathan P. Dyal      jdyal@balch.com

Joseph K. Reid  PHV  jreid@mcguirewoods.com

Katherine K. Smith      ksmith@cmslawyers.com

Kathleen Taylor Sooy - PHV      ksooy@crowell.com

Kenneth W. Barton      ken.barton@butlersnow.com

Kerry E. Kolodziej - PHV      kkolodziej@mayerbrown.com

Kerry J. Miller - PHV      kmiller@frilot.com

Kevin P. Holewinski - PHV      kpholewinski@jonesday.com

Lawrence E. Abbott - PHV      labbott@csa-lawfirm.com

Louis M. Grossman - PHV      louis.grossman@keanmiller.com

Maria V. Gillen – PHV      mvgillen@tva.gov

Mary S. Johnson - PHV      msj@JGMcLaw.com

Matthew Heartney PHV matthew.heartney@aporter.com

Michael B. Wallace      mbw@wisecarter.com

Michael D. Freeman-PHV mfreeman@balch.com

Michael Edward Whitehead      michael.whitehead@pmp.org

Michael L. Rice - PHV      mlrice@jonesday.com,

Michael R. Kelly      mkelly@danielcoker.com,

Michael R. Phillips - PHV      mike.phillips@keanmiller.com,

Nicholas C. Giallourakis      giallourakisnc@fpwk.com

Norman G. Hortman , Jr      ghortman@hortmanharlow.com,

Norman W. Fichthorn - PHV      nfichthorn@hunton.com

Peter D. Keisler - PHV      pkeisler@sidley.com

Philip H. Curtis – PHV      philip.curtis@aporter.com

Quin M. Sorenson - PHV      qsorenson@sidley.com,

Richard F. Bulger - PHV      rbulger@mayerbrown.com

Richard P. Salloum      rps@frslaw.com, jll@frslaw.com

Richard Trent Taylor      rtaylor@mcguirewoods.com

Rick Richmond – PHV      rrichmond@jenner.com,

Robert D. Gholson      gholson@gbeolaw.com,

Robert E. Meadows - PHV      rmeadows@kslaw.com

Ronald Specter - PHV      rspecter@specterlaw.com

Ronald G. Peresich      rgp@pmp.org, brenda.smith@pmp.org

Scott Lewis Winkelman - PHV      swinkelman@crowell.com

Shawn Patrick Regan - PHV      sregan@hunton.com

Shellye V. McDonald      svm@frslaw.com

Sherrie L. Moore      smoore@webbsanders.com

Steven Robert Williams  srwilliams@mcguirewoods.com

Taylor B. McNeel      tmcneel@brunini.com

Thomas E. Fennell - PHV      tefennell@jonesday.com,

Thomas L. Carpenter, Jr. tcarpenter@carrallison.com

Tim D. Gray      timgray@fpwk.com

Timothy S. Bishop - PHV     tbishop@mayerbrown.com

Tracie J. Renfroe - PHV     trenfroe@kslaw.com,

Tracy A. Roman - PHV     troman@crowell.com

W. Kelly Stewart - PHV     kellystewart@jonesday.com

Watts C. Ueltschey     wueltschey@brunini.com

William C. Brabec     bill.brabec@arlaw.com

William L. Watt     lwatt@blswlaw.com,

Zachary Robert Stump - PHV     zstump@kslaw.com

Done this the 9th Day of December, 2011

_s/F. Gerald Maples_____
F. Gerald Maples